932 F.2d 964
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
TOTAL INERT MAINTENANCE & EQUIPMENT, INCORPORATED, Catalyst
Technology, Incorporated, Plaintiffs-Appellants,
v.
UNION CARBIDE CORPORATION, Defendant-Appellee.
 No. 90-2387.
 United States Court of Appeals, Fourth Circuit.
 Argued March 7, 1991.
Decided May 13, 1991.
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. Herbert F. Murray, Senior District Judge. (CA-88-3931-HM)
 Allan Pike Hillman, Frank, Bernstein, Conaway & Goldman, Baltimore, Md. (Argued), for appellants; Peter H. Gunst, Robert B. Levin, Kim C. Jackson, Frank, Bernstein, Conaway & Goldman, Baltimore, Md., on brief.
 James Earl Gray, Goodell, Devries, Leech & Gray, Baltimore, Md. (Argued), for appellee; Linda S. Woolf, Goodell, Devries, Leech & Gray, Baltimore, Md., on brief.
 D.Md.
 AFFIRMED.
 Before MURNAGHAN and NIEMEYER, Circuit Judges, and JANE A. RESTANI, Judge, United States Court of International Trade, sitting by designation.
 PER CURIAM:
 
 
 1
 * Total Inert Maintenance & Equipment, Inc. ("TIME"), the purchaser, and Union Carbide Corporation ("Union Carbide"), the seller, signed a Purchase Agreement on June 17, 1986. TIME agreed to buy all the capital stock of Catalyst Technology, Inc. ("CAT TECH"), a wholly-owned Union Carbide subsidiary, for $7,500,000. The Purchase Agreement contained two relevant provisions insofar as the present litigation is concerned: a) a warranty and representation clause, and b) an indemnification clause.
 
 
 2
 The warranty and representation clause[1] represented, warranted, and convenanted to TIME as of the Purchase Agreement and closing date:
 
 
 3
 4.20 Claims, Investigations and Litigation. Except as set forth on Schedule 4.20, CAT TECH has no outstanding litigation, legal action, claims, arbitration proceedings, product liability claims, unfair labor practice charges, wage and hour claim or investigation or employment discrimination charges and no government or quasi-governmental proceedings or investigation that is pending or threatened in any form against CAT TECH.
 
 
 4
 The following section outlined the indemnification provision:
 
 
 5
 7.1. Indemnification. The SELLER shall defend, indemnify and hold harmless BUYER from and against any and all losses, claims, liabilities, damages, judgments, decisions, orders, decrees and expenses, for money or other relief, including but not limited to reasonable attorneys' fees, accounting fees, costs and expenses, to the extent that such losses are not covered by insurance, incurred or suffered by BUYER arising from (i) the breach by the SELLER or, for the period prior to Closing, by CAT TECH, of any covenant, representation or warranty made in this Agreement, (ii) any act or omission of the SELLER or, for the period prior to closing, by CAT TECH in breach of this Agreement, (iii) any misrepresentation in or omission from any instrument, document or information delivered by the SELLER or CAT TECH pursuant to this Agreement....
 
 
 6
 Schedule 4.20 listed "Pending Claims/Litigation Against CAT TECH." Included in the schedule were claims filed on August 10, 1985 with the Equal Employment Opportunity Commission ("EEOC") by Barbara Ann Evans and Kimberly Lassiter. The schedule described the Evans claim as "Sex discrimination, sexual harassment by coworkers. Termination allegedly result of employee's objection to harassment." It described the Lassiter claim as "Sex discrimination." Under "Damages Claimed" for both claims, the schedule stated "Re-instatement plus back pay. Damages estimate at 2 X annual salary."[2] The "Status" column noted that the "EEOC claim filed; CAT TECH filed response. Matter Pending."
 
 
 7
 On June 12, 1986, five days before the Purchase Agreement was signed and about a month before the closing, Evans and Lassiter filed a pro se complaint against CAT TECH in the Superior Court for Solano County, California. The suit contained counts against CAT TECH for wrongful termination, sexual harassment, intentional infliction of emotional distress, negligence, racial discrimination, and intentional interference with prospective economic advantage. The plaintiffs requested special damages, general damages "in excess of $100,000," punitive damages "in excess of $500,000," attorneys fees, and costs. The complaint, however, was not served. On October 6, 1986, after the closing, an amended complaint was served on CAT TECH and Union Carbide.
 
 
 8
 Union Carbide has claimed that it had no knowledge of the California lawsuit prior to the signing of the Purchase Agreement or the closing. TIME has argued, however, that CAT TECH received a copy of a "Notice of Case Closure," dated October 18, 1985, stating that the administrative case with respect to Evans was closed "on the basis of complainant elected court action."[3]
 
 
 9
 In October 1986, TIME sought indemnification upon learning of the California lawsuit. Union Carbide refused to pay indemnification. CAT TECH has claimed that it spent approximately $500,000 in resolving the suit.
 
 
 10
 After the sale, CAT TECH became a wholly-owned subsidiary of TIME. Union Carbide has maintained that TIME continued a separate corporate existence with separate officers and a bank account. TIME has replied that "[w]hile TIME held certain licenses, and had its own officers its operational functions ceased and it became a holding company for its wholly-owned subsidiary, CAT TECH." After the acquisition of CAT TECH, TIME reorganized previous TIME operations into CAT TECH's management system; however, TIME's corporate existence with corporate officers continued in order to maintain a license agreement with Shell-Canada. CAT TECH, not TIME, paid the money to resolve the California litigation. Nevertheless, TIME has contended that the financial result of the litigation would have been the same if CAT TECH had placed money in TIME's "inactive bank account" and then TIME had written the checks for the litigation costs.
 
 
 11
 TIME and CAT TECH filed suit against Union Carbide to recover indemnification expenses attributable to the California lawsuit. In 1989, TIME and CAT TECH moved for summary judgment; Union Carbide opposed the motion and also moved for summary judgment. Union Carbide argued that TIME had not "incurred or suffered" damage because CAT TECH had written the checks, that TIME could not disregard the corporate entities in bringing suit, and that CAT TECH was not a beneficiary of the Purchase Agreement.
 
 
 12
 The district court granted summary judgment for Union Carbide on April 17, 1990. The judge stated that the "basic issue raised ... is whether either plaintiff has standing to sue UCC, even assuming, arguendo, that UCC had breached the warranties...." The judge concluded that neither TIME nor CAT TECH could recover and granted summary judgment in favor of Union Carbide. First, the judge determined that, because CAT TECH had paid the litigation costs, TIME had not incurred or suffered any losses. The judge stated that one could not disregard that, even if TIME held one hundred percent of the capital stock, TIME and CAT TECH had separate corporate identities. Having chosen separate incorporation to gain certain benefits, they could not also expect the benefits of being treated by the law as a single entity. Second, the judge concluded that under New York law, although one could pierce the corporate veil if fraud was present, one could not do so merely to attain a benefit for the corporation or its shareholders. Third, the judge concluded that CAT TECH was only an incidental beneficiary of the Purchase Agreement and therefore could not bring suit as a third party to recover the litigation expenses. The judge found that there was no evidence suggesting that anyone had intended to create rights in the form of direct benefits in CAT TECH as a third party. He noted that the parties could have extended, but did not extend, the indemnification clause to CAT TECH.
 
 II
 
 13
 Much time and effort has been spent on the question of whether the Settlement Agreement or state law creates the capacity in TIME or CAT TECH to recover for any alleged breach of the warranties. Issues have arisen of:
 
 
 14
 1) The meaning of "suffer" and "incur" in the Settlement Agreement;
 
 
 15
 2) TIME's ability to reverse pierce the corporate veil to recover indemnification despite CAT TECH's status as a separate corporate entity and CAT TECH's payment of litigation expenses; and
 
 
 16
 3) Third-party beneficiary status for CAT TECH.
 
 
 17
 Without casting doubt on the district court's conclusions, we find it unnecessary to pursue any of these issues. On summary judgment, the court considers the case de novo, drawing inferences from the record in the light most favorable to the nonmoving party. See Pachaly v. City of Lynchburg, 897 F.2d 723, 725 (4th Cir.1990); Ottensmeyer v. Chesapeake & Potomac Telephone Co., 756 F.2d 986, 992 n. 12 (4th Cir.1986). The court may affirm the judgment on appropriate grounds not relied upon by the district court. See Coral Petroleum, Inc. v. Banque Paribus-London, 797 F.2d 1351, 1355 n. 3, reh'g denied, 801 F.2d 398 (5th Cir.1986).
 
 
 18
 We conclude that the warranties were not breached for the following reasons. First, the existence of the Evans and Lassiter claims was disclosed on Schedule 4.20. Second, an attorney with Frank, Bernstein who specialized in labor and employment law reviewed the Union Carbide files relating to the two claims. At deposition, the lawyer testified that he was "very much" aware that an administrative claimant in the EEOC or the California Department of Fair Employment and Housing had the right to file a civil lawsuit. He realized that Lassiter also had race discrimination allegations. He researched California law, realized that punitive damages were possible, and knew of California's reputation as a state with liberal judgments. Third, the October 1985 Evans notice did not state that a complaint had been filed, only that, with respect to Evans, "complainant elected court action." Even assuming that CAT TECH and/or Union Carbide had been aware of the Notice, the alleged failure to inform TIME did not breach the warranty or amount to an omission of material fact under provision 4.27 of the Settlement Agreement. Fourth, although the estimate of the claims' magnitude turned out to have been too optimistic, the amount which will eventuate in unliquidated damages is necessarily uncertain and insufficient evidence has been produced to raise an issue of disputed fact as to whether the estimate was in any way inaccurate when assessed as of closing. Disclosure of the claims on schedule 4.20 in these circumstances satisfied the Purchase Agreement.
 
 
 19
 The judgment for Union Carbide is, accordingly,
 
 
 20
 AFFIRMED.
 
 
 
 [1]
 The warranties were made by Union Carbide and CAT TECH. Union Carbide has explained that this language had been requested by the law firm, Frank, Bernstein, Conaway & Goldman. The language had been inserted during earlier negotiations when CRI Ventures ("CRIV"), a joint venture between Shell Oil Company, U.S. and Catalyst Recovery, Inc., planned to acquire CAT TECH. Frank, Bernstein represented CRIV and drafted the Purchase Agreement. Before the Purchase Agreement was executed, CRIV substituted TIME, apparently a wholly owned subsidiary of Catalyst Recovery, Inc., as the buyer
 
 
 [2]
 Union Carbide's law department sent a letter on May 6, 1986 stating the "actual or recommended liability reserves for claims against" CAT TECH. The two EEOC claims were set at $40,000. The letter concluded, "Given the above [a total estimate of $242,000] the $250,000 reserve discussed at our last meeting appears fairly accurate."
 
 
 [3]
 Union Carbide amended its answer to TIME's complaint to raise a counter claim against CAT TECH. The former president and general manager of CAT TECH testified at deposition that CAT TECH knew of "the imminency of the Evans/Lassiter lawsuit prior to the execution of the Purchase Agreement." Union Carbide has asserted that such knowledge was in "contravention of specific instructions" from Union Carbide concerning the conveyance of such information. CAT TECH also claimed that it forwarded a copy of the 1985 notice to Union Carbide. Union Carbide has denied receiving it